69 U.S. 366
 17 L.Ed. 906
 2 Wall. 366
 THE SLAVERS. (SARAH.)
 December Term, 1864
 
 LIKE the preceding case, this was a libel of forfeiture, filed in the District Court for the Southern District of New York, against a vessel and cargo, under the 1st section of the act of Congress of 22d March, 1794,[1] and the 2d of that of 20th April, 1818,[2] prohibiting persons engaging in the slave-trade.
 The former declares that no person shall 'build, fit, equip, load, or otherwise prepare any ship or vessel, within any port or place of the United States, nor shall cause any ship or vessel to sail from any port or place within the same, for the purpose of carrying on any trade or traffic in slaves, to any foreign country; or for the purpose of procuring from any foreign kingdom, place, or country, the inhabitants of such kingdom, place, or country, to be transported to any foreign country, port, or place whatever, to be sold or disposed of as slaves; any ship or vessel so fitted out, &c., to be forfeited to the United States,' &c.
 The latter is of an import essentially the same; its language being, 'for the purpose of procuring any negro, mulatto, or person of color.'
 One Couillard intervened, on the 3d of May, 1861, as claimant and bailee of the cargo, which was stated to belong to R. J. Arguelles, who, however, did not in any way appear. Arguelles, or some person bearing that name, had sworn to it as of the value of $22,000. There was no denial that the vessel was on her voyage to the African coast. Her clearance, in fact, had been for Cape Palmas.
 The Sarah was a bark of about 260 tons, 103 feet long, 25 feet broad, 11 feet 3 inches deep, with three masts, was similar to the Kate, condemned (supra, p. 366) for being engaged in the slave-trade. She was clipper-built, intended for fast sailing, with high and light spars, calculated to carry a press of canvas, and sharp. Her cooking-galley was 19 to 20 feet long, and wide in proportion. She had on deck a number of extra spars, similar to those on the Kate, and besides her ordinary boats, two large surf-boats. The manifest showed a large quantity (19,448 gallons) of what is called 'oil-cask shucks,' with a proportionate quantity of iron hoops and rivets. These would hold water as well as oil. It was proved that these casks—'oil casks'—are found in large quantities on nearly all vessels condemned as slavers. On examining the cargo, 15 or 16 barrels of beef or pork not on the manifest, also 16 barrels of bread and 6 barrels of flour, and 1 tierce of rice, marked for the homeward passage in plain letters, were found on the vessel. There were half a dozen water-casks on deck, besides the casks in shucks on manifest, which were of the same style as those on board the Kate.
 The manifest showed 150 hogsheads of rum, also cases of muskets.
 On the 7th of March, 1861, Augustus Head, Jr., of Boston, had purported to sell the bark to one 'C. P. Smith, of the city of New York,' for $9250, and he, on the 11th of March, sold her to Couillard, the intervener, for $10,000. No proof of actual sale was made. De Graw, a clerk in the custom-house for seven years, testified that, on the sale or transfer of slavers, he had noticed that there are usually two or three transfers made previous to the sailing; that he did not know of any P. C. Smith engaged in the trade; that he had looked in New York city directories carefully for C. P. Smith for five years; that the name was not there; and had looked (though in vain) in one Brooklyn directory. The claimant did not attempt to prove the existence of such a person. De Graw, the clerk above mentioned, stated that he knew the principal houses in New York engaged in the legal trade to the African coast, but did not know any such persons as Couillard or Arguelles.
 The deputy marshal who seized the bark stated that he seized her fifteen miles down the New York bay. When approaching, and within half a mile of her, he saw through a spy-glass that several persons on board were examining the vessel he was on, and that immediately after, from the vessel which they were watching, somebody threw a box, about 2 by 3 feet in size, overboard, which sank. Couillard was on board, in command, when this occurred. He gave no explanation of the fact.
 In addition to the facts already stated, it appeared that one Miller, who had shipped under the name of Reed, had authority to ship men for the voyage, and to exercise control in the absence of Captain Couillard. He stated to a seaman named Delano that he was to be the actual master of the vessel. He shipped Delano under the name of Comstock, and paid his advance-money.
 Delano swore that Miller, 'on board, acted as captain, mate, and all hands,' and signed receipts for the cargo. Miller, in the act of employing Delano, represented himself as master of the vessel; said 'he was going to the coast of Africa; was going black-birding,' and sometimes used the word 'ebony,' and tried to induce the witness to go along by giving him liquor, and by promises of large profits. He said, 'If you go with me, you will be gone about four months, and have about $3000 or $4000 when you get back.' On another occasion, he said that 'he was going over to the coast of Africa, and wanted me to go as second mate.' Such, at least, was the testimony of some of these parties. There was, however, no more specific evidence against the vessel. No manacles nor unusual supply of medicines were found on her, and the cargo was one which would have suited a lawful voyage to the African coast.
 The District Court condemned the bark. The Circuit Court affirmed the decree. Appeal here. After an able argument by Mr. Evarts for the appellant, and by Mr. Coffey, special counsel of the United States, contra,——
 Mr. Justice CLIFFORD delivered the opinion of this court.
 
 
 1
 This was a case of seizure and forfeiture, and the case comes before the court on appeal from a decree of the Circuit Court of the United States for the Southern District of New York.
 
 
 2
 Referring to the transcript, it will be seen that the libel of information was against the bark Sarah, her tackle, apparel, and furniture, and the lading on board, and that a decree was entered in the District Court condemning both the vessel, &c., and her cargo, as forfeited to the use of the United States. Appeal was taken by the claimant to the Circuit Court, where the parties were again heard, but the Circuit Court affirmed the decree, and the claimant again appealed to this court.
 
 
 3
 1. Allegations of the libel are founded upon the first section of the act of the twenty-second of March, 1794, and the second section of the act of the twentieth of April, 1818, prohibiting any person or persons from engaging in the slave-trade. In order to entitle the libellants to a decree of condemnation, they must prove either that the vessel was fitted, equipped, loaded, or otherwise prepared for the voyage, or that she was caused to sail on the voyage in which she was engaged for the purpose of carrying on a trade or traffic in slaves to some foreign country, or for the purpose of procuring from some foreign country, &c., the inhabitants of such country, to be transported to some other foreign country, port, or place, to be sold or disposed of as slaves, or for the purpose of procuring negroes, mulattoes, or persons of color from some foreign country, to be transported to any port or place whatsoever, to be held, sold, or otherwise disposed of as slaves, or to be held to service or labor.[3]
 
 
 4
 2. Intervening for the interest of himself as owner of the bark and bailee of the cargo, the appellant, on the third day of May, 1861, made claim in the District Court to the vessel and cargo, averring that he was in possession of the same at the time of the seizure, and that he was the true and bona fide owner of the vessel and the bailee of the cargo on board. One of the charges is the fitting out of the vessel, and the other is the causing the vessel to sail, either of which, if proved, will induce a forfeiture. Full proof is exhibited that the vessel had completed her fitting, equipment, and lading, and that she was avowedly proceeding on a voyage to the west coast of Africa, when she was boarded and seized. Obviously, therefore, the main question is one of fact, whether she was fitted out, equipped, and loaded, and was proceeding to that coast for the purpose of a lawful trade, or for the purpose of engaging in the trade or traffic in slaves. Undoubtedly, the statutory offence is completed when the preparations for the voyage have reached a stage which shows satisfactorily that the purpose of the fitting and equipment was such as is described in the libel of information. Plainly, the object of the law is to prevent the preparation of vessels in our ports for that trade; and, consequently, the law looks at the intention, and confers the authority to take from the offender the means required to enable him to perpetrate the mischief.[4]
 
 
 5
 3. Argument for the United States is that the evidence clearly shows that the voyage for which the bark was fitted and prepared, and which she commenced from the port of New York under a clearance for Cape Palmas, on the western coast of Africa, was undertaken for the purpose and with the intent of engaging in the slave-traffic. Claimant denies that proposition, and insists that the evidence offered to prove the allegation is wholly insufficient to warrant any such finding, and, consequently, that both the District and Circuit Courts were in error. He admits, however, that the character of the vessel, her size, build, and equipment, do not absolutely exclude the conclusion that she was capable of such service. Denial of the fact involved in the admission could not well be made, because the proofs are full to the point, not only that she was capable of such service, but that she was, in all respects, well suited to the service, and, indeed, that she was such a vessel as those engaged in the nefarious traffic usually select as best modelled for such an adventure.
 
 
 6
 4. Unlike what is usual in cases of this description, the destination of the vessel is admitted; and it cannot be denied that the destination would have carried her to markets where it is known that the traffic in slaves is prosecuted. Proofs show that she was a vessel of about two hundred and sixty tons burden; that she was a hundred and three feet in length, twenty-five feet in breadth, and eleven feet and three inches deep. She was clipper-built, with three masts, and was adapted for a large press of canvas, and was fast-sailing. Expert witnesses also say that she had a number of extra spars on her deck, similar to other vessels condemned as slavers; and that besides her ordinary boats, she had two large surf-boats not needed by a vessel bound to a regular commercial port. Certain articles of the cargo are also significant of an unlawful purpose. Unusually large quantities of shooks for casks appear on the manifest, and also a proportionate quantity of iron for hoops and rivets for fastening the same. 'Casks in shooks' are the words of the manifest, and the quantity stated is nineteen thousand four hundred and forty-eight gallons for oil; but it is quite obvious that the shooks, when set up and hooped, would be as suitable to hold fresh drinking-water as oil; and the evidence shows that they are found in large quantities on most or all of the vessels condemned as slavers. Some half dozen water-casks were on deck, besides the casks in shooks appearing on the manifest. Fifteen barrels of beef and pork were found on board not on the manifest, and sixteen barrels of bread, and six barrels of flour, and one tierce of rice, plainly marked for the homeward voyage. Other articles on the manifest, which deserve notice, are ten cases of muskets, eleven hogsheads of tobacco, and one hundred and fifty hogsheads of rum, which, the expert witnesses say, is a well-known article of trade in the purchase of negroes. One of the expert witnesses, who had been an entrance and clearance clerk in the custom-house at New York for seven years, testified that he had noticed that vessels designed to be used in the slave-trade were usually transferred two or three times just previous to the sailing of the vessel; and in this case it appears that the bark was, on the seventh day of March, 1861, sold by one Augustus Head to one C. P. Smith, of the city of New York, for the sum of nine thousand two hundred and fifty dollars; and that the purchaser, four days afterwards, conveyed the same to the present owner. None of the witnesses know the last-named grantor, and one of them testifies that he has looked carefully into the directories of the city of New York and of the city of Brooklyn for the last five years, and that he can find no such name. Suspicion also attaches to the conduct of the present owner, both in his character as such, and as master for the voyage, and he has not employed any proper means to repel that suspicion. He has produced a bill of sale from C. P. Smith, but he has not introduced the grantor as a witness or either of the witnesses of the bill of sale. And he has failed to show, what might easily be proved, if true, that he actually paid the consideration expressed in the bill of sale or any other sum for the vessel, or that there is or ever was any such person as the one therein named as his grantor.
 
 
 7
 5. Common prudence required him to explain these matters, and yet he has neglected to do so; and he has also neglected to furnish other explanations of equal importance: As, for example: the bill of lading discloses the fact that the vessel was under a charter-party, but he neither produces the instrument nor attempts to account for its absence. Testimony was also introduced by the libellants showing, beyond controversy, that as the boarding officers approached the vessel for the purpose of seizing her, some person or persons on board the bark were seen to throw overboard a large box, which immediately sank, and yet the claimant does not attempt to explain the transaction. Although he claims as bailee of the cargo, still he offers no proof to show where or by whom it was purchased, or how or by whom it was paid for, and furnishes no explanation upon the subject. Evidence to show that he was engaged in any legitimate trade to that quarter of the globe, or that he had any connection with any commercial house lawfully trading on that coast, is entirely wanting; and it does not appear that he had made any arrangements for an honest return cargo. Large quantities of beef, pork, and bread, not on the manifest, were found on board, but he offers no explanation of the matter, and does not even examine the mate or any one of the crew. Shipper of the cargo, R. J. Arguelles, is not introduced, although it appears that the value of the shipment, as sworn to by him, was twenty-two thousand dollars; still, he does not appear as claimant, nor is he examined as a witness. Appellant claims the cargo as bailee, but he nowhere states or proves for whom he is bailee, and nothing in the case shows satisfactorily who is the real owner of the goods.
 
 
 8
 6. Considered as a whole, the various circumstances to which reference has been made afford very strong ground of presumption that the allegations of the libel of information are true. Evidence which satisfies the mind of the truth of the fact in dispute, to the entire exclusion of every reasonably doubt, says Mr. Starkie, constitutes full proof of the fact, and it would seem that the combined force of these various circumstances can scarcely fail to generate that full belief.[5]
 
 
 9
 Doubt cannot be entertained, that the circumstances adverted to are fully established, and it is certain that they are consistent with the hypothesis assumed by the United States. Some of them, it must be admitted, if separately considered, are not of a conclusive nature and tendency, but taken as a whole, it is difficult to say that they do not satisfy the mind of the truth of the charge, even to the exclusion of every reasonable doubt.
 
 
 10
 7. Suppose it were otherwise, however, still there is direct evidence in the case which, when considered in connection with the circumstantial facts, fully establishes the charge. Reference is here made to the statements of the mate, who is proved to have shipped under a false name, and the whole evidence shows that he had authority to ship men for the voyage, and to exercise control in the absence of the master. Suggestion of the appellees is that he was to have been the master for the voyage, and it must be admitted that there are many facts and circumstances in the case which give countenance to that theory, but it is unnecessary to determine the point in this investigation, as it is clearly proved that he was authorized to ship men as part of the crew, and to perform the duties of master, when the person recognized as such in the ship's papers was absent. Seaman Delano was shipped by him under the name of Comstock, and he collected his advance-money from the clerk of the shipping notaries, and paid it to the seaman as one of the crew. Delano testifies that the mate 'acted as master, mate and all hands,' and it is fully shown that he signed receipts for cargo. While in the act of employing the seaman, when clearly he was acting as master of the vessel, he stated that he was going to the coast of Africa, and that he was to be master of the vessel. He also 'said he was going blackbirding,' and endeavored to persuade the witness to enlist and go with him, by promises of large profits. Among other things, he also stated that they would be gone about four months, and that the witnesses, if he would go, would have three or four thousand dollars when he got back; and on another occasion, he stated that the bark was going on a trading voyage to the African coast, and would probably bring back some negroes. Viewed in connection with the circumstantial evidence, these statements are regarded as affording full proof of the truth of the allegations contained in the libel of information. Such were the views of the District and Circuit Courts, and we have no doubt they are correct.
 
 
 11
 The decree of the Circuit Court is therefore
 
 
 12
 AFFIRMED.
 
 
 
 [1]
 1 Stat. at Large, 347.
 
 
 [2]
 3 Id. 450.
 
 
 [3]
 1 Stat. at Large, 347; 3 Id. 451.
 
 
 [4]
 The Emily and Caroline, 9 Wheaton 381.
 
 
 [5]
 1 Starkie on Evidence, p. 450.